COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:    Judges Beales, Raphael and Bernhard
Argued at Arlington, Virginia


BOARD OF COUNTY SUPERVISORS OF
  PRINCE WILLIAM COUNTY, VIRGINIA

v.        Record No. 1590-25-4

OAK VALLEY HOMEOWNERS
  ASSOCIATION, INC., ET AL.

GW ACQUISITION CO., LLC, ET AL.

v.        Record No. 1584-25-4
                                                            OPINION BY
OAK VALLEY HOMEOWNERS                         JUDGE STUART A. RAPHAEL
  ASSOCIATION, INC., ET AL.                        MARCH 31, 2026

H&H CAPITAL ACQUISITIONS, LLC

v.        Record No. 1592-25-4

OAK VALLEY HOMEOWNERS
  ASSOCIATION, INC., ET AL.

KATY BURKE, ET AL.

v.        Record No. 2025-24-4

BOARD OF COUNTY SUPERVISORS OF
  PRINCE WILLIAM COUNTY, VIRGINIA, ET AL.

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Kimberly A. Irving, Judge[1]
Tracy C. Hudson, Judge[2]

(Andrew R. McRoberts; Maxwell Hlavin; Adam B. Winston; Michelle R. Robl, County Attorney; Curt G. Spear, Jr., Deputy County Attorney; Alan F. Smith, Chief Deputy County Attorney; Derek Reigle; Sands Anderson PC; Prince William County Attorney's Office, on briefs), for Board of County Supervisors of Prince William County, Virginia. Board of County Supervisors of Prince William County, Virginia, submitting on brief.

Robert W. Loftin (John J. Woolard; Richard J. Batzler; Juliet B. Clark; Bridget E. Maas; Roman Martinez; Brittany M.J. Record; Sakina Haji; Connor Clerkin; Michael Tucci; McGuireWoods LLP; Latham & Watkins LLP; Stinson, LLP, on briefs), for GW Acquisition Co., LLC, and GW Acquisition Co. I, LLC.

Matthew A. Westover (John H. Foote; Mark C. Looney; Lee Gleason; Walsh, Colucci, Lubeley & Walsh, P.C.; Cooley LLP, on briefs), for H&H Capital Acquisitions, LLC.

Craig J. Blakeley (Alliance Law Group LLC, on briefs), for appellees in Record Nos. 1584-25-4, 1590-25-4, and 1592-25-4.

J. Chapman Petersen (Christopher T. Robertson; Chap Petersen & Associates, PLC, on briefs), for appellants in Record No. 2025-24-4.

Amici Curiae: Virginia Association for Commercial Real Estate, NAIOP Northern Virginia, the Commercial Real Estate Development Association, and Home Builders Association of Virginia (Juli M. Porto; Blankingship & Keith, P.C., on brief), for appellants in Record Nos. 1584-25-4, 1590-25-4, and 1592-25-4.

---

[1] Judge Irving was the trial judge in *Oak Valley Homeowners Association, Inc. v. Board of County Supervisors of Prince William County*, CL24-375 (Record Nos. 1584-25-4, 1590-25-4, and 1592-25-4).

[2] Judge Hudson sustained the demurrers in *Burke v. Board of County Supervisors, Prince William County*, CL24-334 (Record No. 2025-24-4).

Amici Curiae: Piedmont Environmental Council, Association for the Preservation of Virginia Antiquities, National Parks Conservation Association, National Trust for Historic Preservation in the United States, Coalition to Protect America's National Parks, and Coalition to Protect Prince William County (Michael H. Brady; P. Thomas DiStanislao; Whiteford, Taylor & Preston L.L.P., on brief), for appellees in Record Nos. 1584-25-4, 1590-25-4, and 1592-25-4.

The landowners in these four appeals challenge the validity of three rezoning ordinances enacted by the Board of County Supervisors of Prince William County (the "Board") to permit the development of numerous data centers in a largely rural part of the county previously zoned for agricultural uses. H&H Capital Acquisitions, LLC ("H&H") is the applicant for the largest of the three rezonings, known as "Compass." Two other rezonings—on the north and south sides of the Compass rezoning—are known as Digital Gateway North ("DG North") and Digital Gateway South ("DG South"). GW Acquisition Co., LLC ("GW") is the applicant for the DG South rezoning. GW Acquisition Co. I, LLC ("GW I") is the applicant for the DG North rezoning. We refer to H&H, GW, and GW I collectively as the "developers."

In *Burke*, ten landowners (the "Burke plaintiffs") sued the Board and the developers, contending (among other things) that the zoning ordinances are void ab initio on the ground that the advertising for the Board's December 2023 public hearing at which the ordinances were adopted violated Code § 15.2-2204(A) and Prince William County Zoning Ordinance § 32-700.60. Judge Tracy C. Hudson sustained the Board's demurrer and dismissed those challenges with prejudice. The Burke plaintiffs noted a timely appeal, docketed here as Record No. 2025-24-4.[3]

---

[3] At appellants' request, we dismissed five of the Burke plaintiff-appellants with prejudice by order entered January 29, 2026.

In a separate case, the Oak Valley Homeowners Association and 11 other landowners (the "Oak Valley plaintiffs") sued the Board and the developers, also seeking to invalidate all three ordinances. While the *Burke* appeal was pending, Judge Kimberly A. Irving conducted a five-day bench trial on the Oak Valley plaintiffs' claim that all three ordinances are void ab initio for the same advertising deficiencies alleged in *Burke*. Judge Irving found for the Oak Valley plaintiffs and invalidated all three ordinances. The Board and the developers each appealed, and those appeals were docketed here as Record Nos. 1584-25-4, 1590-25-4, and 1592-25-4 (collectively, the "*PWC* appeals").

We granted the Board and the developers' motion to consolidate and expedite the *PWC* appeals and to pair them for argument with *Burke*. We stayed execution of Judge Irving's judgment except to the extent it barred the developers from engaging in land-disturbing or construction activities on the land in question.

For the reasons set forth below, we hold that one or more of the Oak Valley plaintiffs has standing to challenge all three rezonings. We further hold that Judge Irving correctly found that the Board's advertising for the December 2023 public hearing violated Code § 15.2-2204(A) and Prince William County Zoning Ordinance § 32-700.60, rendering those rezonings void ab initio.

In *Burke*, we hold that Judge Hudson erred in sustaining the Board's demurrer to the landowners' claims in Count IX, which raised the same advertising deficiencies on which we affirm the judgment invalidating the rezoning ordinances in the *PWC* appeals. There is no reason to remand *Burke* for further proceedings in the trial court, however, as our ruling in the *PWC* appeals moots the Burke plaintiffs' need for further relief.

In resolving these appeals, we make clear that a public body must advertise proposed zoning ordinances in compliance with Code § 15.2-2204(A) and with any non-conflicting advertising requirements self-imposed by ordinance. The saving provision in Code § 15.2-2204(B)—which

- 4 -

excuses a violation of the written-notice requirement for affected and adjacent landowners who had "actual notice of" the hearing or who actively participated in it—does not excuse advertising deficiencies under subsection A. In other words, in a timely challenge brought under Code § 15.2-2204(E), a plaintiff who alleges and proves standing may enforce the mandatory public advertising requirements, even if the plaintiff knew about and actively participated in the public hearing.

BACKGROUND

In the *PWC* appeals, we view the facts in the light most favorable to the Oak Valley plaintiffs because they prevailed at the bench trial below. *E.g.*, *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 (2022). In the *Burke* appeal, where the trial court sustained the defendants' demurrers, we likewise view the facts alleged in the petition in the light most favorable to the plaintiffs. *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 382 (1997).[4]

*A. The Compass, DG South, and DG North rezonings*

In November 2022, the Board enacted the Digital Gateway Comprehensive Plan Amendment ("CPA") to facilitate the development of data centers in Prince William County. PWC Comprehensive Plan Amendment #CPA2021-00004 (Nov. 1, 2022). Most of the Oak Valley plaintiffs in this case also filed suit in 2022 to invalidate the CPA. On appeal from the circuit court's decision sustaining the Board's demurrer, we found that plaintiffs who lived within 2,000 feet of the CPA area and who pleaded specific harms from data-center development had

---

[4] One procedural difference between the appeals concerns the relevance of the lengthy administrative record, which was filed in each case after the trial court granted the defendants' motions craving oyer. In the *PWC* appeals, where the demurrers were overruled, we consider only the portions of the administrative record that were admitted into evidence at trial. In the *Burke* appeal, where the trial court sustained the demurrers, we may consider anything in the administrative record that was filed with the trial court and available for review on the demurrer. As a practical matter, however, this slight procedural difference does not affect the outcome.

adequately alleged standing. *Oak Valley Homeowners Ass'n v. Prince William Cnty. Bd. of Supervisors*, 85 Va. App. 382, 389-90 (2025) (*Oak Valley I*). But we rejected their claim on the merits that the members of the Board had a duty under Code §§ 15.2-2204 and -2229 to "listen to and consider" the public comments at the marathon public hearing that preceded the 2022 vote.[5] *Id.* at 392-99. The Supreme Court refused the Oak Valley plaintiffs' petition for appeal. *Oak Valley Homeowners Ass'n v. Prince William Cnty. Bd. of Supervisors*, No. 250772 (Va. Dec. 23, 2025) (order).

Following the Board's 2022 approval of the CPA, the developers applied for the three rezonings at issue here. As ultimately approved by the Board:

- The largest rezoning, Compass (REZ2022-00036), involves 103 parcels divided into 11 land bays across 884 acres. PWC Ord. 23-57. It would allow H&H to develop 11.5 million square feet of gross floor area. Building heights in most land bays are capped at 85 feet.

- DG North (REZ2022-00032) affects 534 acres and would allow GW I to develop 7 million square feet of gross floor area. PWC Ord. 23-59. Building heights are capped at 83 feet.

- DG South (REZ2022-00033) affects 342 acres and would allow GW to develop 3.7 million square feet of gross floor area. PWC Ord. 23-58. Building heights are capped at 60 feet.

As many as 37 data centers would be constructed in the rezoned areas. Once constructed, the data centers would operate continuously, "24/7." Proffers incorporated into each rezoning ordinance would cap the noise emanating from the facilities at 60 decibels during the daytime and 55 decibels as night—as measured from the outer boundary of any land zoned for residential use. Those limits, however, would not apply to noise during construction or noise from emergency generators used during electrical outages.

_____

[5] We granted leave in *Oak Valley I* for H&H, GW, and GW I to file an *amicus curiae* brief.

- 6 -

The DG South and DG North rezonings are on the south and north sides of the Compass rezoning. Defense Exhibit 28 is a satellite image of the area with the Compass parcels shown in blue and the DG North and South parcels shown in red:



On November 8, 2023, the Prince William County Planning Commission recommended that the Board deny all three rezonings. The Board scheduled a public hearing on the developers' rezoning applications for Tuesday, December 12, 2023.

B. *The advertising problems for the December 12 hearing*

The version of Code § 15.2-2204(A) that governed the Board's obligation to advertise that public hearing was the version as amended by the General Assembly effective July 1, 2023. *See* 2023 Va. Acts chs. 506, 507; Code § 15.2-2204(A) (Supp. 2023). The Board was required to advertise its intention to adopt each rezoning ordinance by publishing an advertisement "once a week for two successive weeks in some newspaper published or having general circulation in the

locality, with the first notice appearing no more than 14 days before the intended adoption."
Code § 15.2-2204(A) (Supp. 2023). The statute defined "two successive weeks" to mean "that
such notice shall be published at least twice in such newspaper, with not less than six days
elapsing between the first and second publication." *Id.* The text of the proposed ordinance was
required to "be advertised in full" or "by reference." *Id.* If the text were advertised by reference,
the ad had to "identify the place or places within the locality where copies of the proposed plans,
ordinances or amendments may be examined." *Id.*

The version of the Prince William County Zoning Ordinance then in effect (last amended
in 2018) imposed overlapping advertising requirements. The ordinance required the Board to
hold the public hearing "not less than five days nor more than 21 days after the second
advertisement shall have appeared." PWC Ord. § 32-700.60 (2018). The advertisements also
had to identify where "copies of such amendments . . . may be viewed." *Id.*

To hold the hearing in compliance with those advertising requirements, the Board
planned for the first ad to run in *The Washington Post* on November 28 (14 days before the
December 12 hearing) and for the second ad to run on December 5 (more than 6 days later and
7 days before the hearing). The Board's clerk emailed the *Post* shortly after noon on Monday,
November 20, submitting the requested ad and the requested run dates. The *Post* replied two
hours later, noting that the ad would cost $7,509.48. The email stated, "Below are the details of
your saved ad. Saved ads will not run unless they are scheduled and submitted." Two minutes
later, the *Post* sent another email advising that the clerk needed to confirm the publication
request by 3:00 p.m. the next day. The clerk failed to call or respond by the deadline.

It is undisputed that the first ad did not run on November 28, but the parties dispute who
was responsible. The Board claims that it submitted a proper ad request and that the *Post*'s
failure to publish the ad entitled the Board to the safe-harbor provision in Code § 15.2-2204(A),

excusing the defect if the ad runs "in the next available edition." The Burke and Oak Valley plaintiffs, on the other hand, claim that the clerk was at fault because she failed to confirm the request in response to the *Post*'s emails.

In *Burke*, relying on the administrative record, Judge Hudson ruled as a matter of law that the Board was entitled to the safe-harbor provision. But in the Oak Valley case, Judge Irving found at trial that the Board was at fault for not responding to the *Post*'s emails, so the Board was not entitled to the safe-harbor provision.

When the first ad failed to run on November 28 (a Tuesday), the Board pressed ahead anyway with the hearing planned for December 12, scrambling to provide additional advertising. The Board ran three ads in the *Post*—on December 2 (Saturday), December 5 (Tuesday), and December 9 (Saturday). The Burke and Oak Valley plaintiffs argue that those ads failed to satisfy the timing requirements of the statute and the ordinance; the Board and the developers disagree.

The parties also dispute whether the Board violated the requirement in Code § 15.2-2204(A) that the advertisement include the text of the proposed plan, ordinance, or amendment "in full" or "by reference." The advertisements here did not include the text in full.[6] If a locality opts to advertise the text "by reference," it must "identify the place or places within the locality where copies of the proposed plans, ordinances or amendments may be examined." Code § 15.2-2204(A) (Supp. 2023). We call this the "where-to-review requirement." The three ads stated: "All meeting materials are posted online when the agenda is published, and a copy of all staff reports, proposed resolutions and ordinances, and other documentation *will be* available for review by the public in the office of the Clerk of the Board . . . ." (Emphasis added.)

---

[6] Alex Vanegas, the Assistant Director of Current Planning for the Prince William County Government, testified that the advertisements contained neither the text of the proposed ordinance nor the proposed proffers that would become part of the ordinance.

Judge Irving found as a fact in the Oak Valley case, however, that "it was not until December 7, 2023"—after the first two ads had already run, and only five days before the public hearing—"that the proposed plans, ordinances and amendments were available to be examined." Still, the Board and the developers argue that the where-to-review requirement is satisfied as long as members of the public are given the required documents at the same time they are distributed to Board members for the public meeting. The Burke and Oak Valley plaintiffs argue that the text of the proposed ordinance must exist and be available for public review when advertised.

### C. The December 12 public hearing

At the beginning of the December 12 public hearing, the Board went into closed session to consult with legal counsel about "probable litigation" over the three rezonings.[7] After returning to open session, Supervisor Robert Weir moved to defer the public hearing "until such date as a proper public notice has issued." He said that doing so would avoid expected litigation. His motion failed by a vote of five to three.

Over the next six hours, the Board heard presentations seriatim for the Compass, DG South, and DG North rezonings. Counsel for each developer delivered a PowerPoint presentation, followed by a report from the Board's staff. The Board's staff recommended that the Board deny all three rezonings on multiple grounds, including that the specific footprints for the data centers had not been submitted for review.

The Board then heard more than 17 hours of public comment, including from three of the Oak Valley plaintiffs: Roger Yackel, Mac Haddow (the Oak Valley president), and Stephanie

---

[7] In *Burke*, counsel for the plaintiffs wrote a letter to the Board dated December 11, 2023, complaining of the advertising defects, urging the Board to "postpone the hearings and provide proper notice," and threatening legal action if the Board failed to do so. Burke Pet. ¶ 249 & Ex. S.

Chartrand. In the early morning hours of December 13, while the public comment period was still underway, the developers submitted revised proffers to the Board's staff.[8] Before the Board vote—in response to Supervisor Jeanine Lawson's question—staff said that it had not been able to thoroughly vet the revised proffers.

Supervisor Weir's motion to deny all three rezonings failed on a four-four vote. Supervisor Victor Angry's motion to approve all three rezonings passed four to three, with one abstention. The Board adjourned at 1:14 p.m. on December 13—27 hours after the meeting had begun.

"Every action contesting a decision of a locality based on a failure to advertise or give notice . . . shall be filed within 30 days of such decision with the circuit court having jurisdiction of the land affected by the decision." Code § 15.2-2204(E). Within that 30-day period, the Burke plaintiffs and Oak Valley plaintiffs sued the Board and the developers, seeking to declare the three rezoning ordinances void ab initio.

*D. The Burke litigation*

The Burke plaintiffs' petition contained ten counts, but we focus here on Count IX, which alleged that the rezoning ordinances were void ab initio because the advertising failed to comply with Code § 15.2-2204(A) and § 32-700.60 of the Prince William County Zoning Ordinance. The Burke plaintiffs alleged:

> 1) the first and second advertisements were published with less than six days between them . . . ; 2) the final advertisement was published less than five days before the public hearing . . . ; and 3) there were no statements—in the notice—to "identify the place

---

[8] *See* Code § 15.2-2303(A) ("The governing body may also accept amended proffers once the public hearing has begun if the amended proffers do not materially affect the overall proposal.").

> or places within the locality where copies of the proposed plans, ordinances, or amendments may be examined."

Burke Pet. ¶ 250.

The trial court entered a consent order granting the defendants' motion craving oyer of the administrative record, which spans more than 66,000 pages. The Board and developers then filed demurrers and pleas in bar.

At a hearing on October 31, 2024, Judge Hudson ruled from the bench. He found that the Burke plaintiffs had sufficiently alleged standing. On Count IX, with respect to the three advertisements on December 2, 5, and 9, Judge Hudson found that the Board failed to comply with the statutory requirement that the second notice be issued not less than six days after the first notice. He further found that the Board failed to comply with the ordinance requirement that there be at least five days between the second notice and the public hearing. He noted the defendants' argument that the plaintiffs had actual notice of the public hearing under Code § 15.2-2204(B), which defendants argued excused any advertising deficiencies under subsection A. But he considered that to be a factual question that could not be resolved on demurrer. Still, Judge Hudson found that the Board was entitled to the saving provision in Code § 15.2-2204(A) when a newspaper fails to run the advertisement as requested. Citing the administrative record, he reasoned that the "county did in fact submit a correct and timely request to the Washington Post. After which, the newspaper failed to publish the notice, and the notice is therefore deemed timely." Judge Hudson found that the other counts also failed to state a claim.

So the court sustained the demurrers and dismissed the petition with prejudice. The Burke plaintiffs timely appealed, and the appellate briefing was completed here on June 11, 2025, a week before the bench trial in the Oak Valley case.

- 12 -

*E. The Oak Valley litigation*

The Oak Valley plaintiffs' amended complaint contained seven counts; Count I focused solely on the alleged advertising defects. As in *Burke*, the circuit court entered a consent order granting the defendants' motion craving oyer of the administrative record. At the demurrer hearing that followed, however, Judge Irving was unable to resolve who was at fault for failing to publish the November 28 advertisement. She said that the administrative record alone did not answer that question. So she overruled the defendants' demurrers to Count I and declined to reach the demurrers to the other counts. Concluding that the advertising issues were potentially dispositive, Judge Irving scheduled an evidentiary hearing solely on Count I.

The five-day bench trial lasted from June 16 to June 23, 2025. Judge Irving received extensive closing-argument briefs and rebuttal briefs from all parties.

In a lengthy letter opinion, Judge Irving concluded that most of the plaintiffs had standing and that all three rezoning ordinances were void ab initio because the Board violated the advertising requirements of both the statute and the ordinance. Reasoning that the three rezonings were interrelated and interdependent, Judge Irving found that any plaintiff with standing to challenge the nearest rezoning also had standing to challenge the other two. On that assumption, she concluded that "[t]en of the twelve Plaintiffs . . . provided credible testimony showing a substantial risk that they were not only located close to the rezonings, but faced a substantial risk of particularized harm as well." Two plaintiffs—John C. Hermansen Trust and Roger A. Yackel—"presented no evidence of any kind," however, so the court granted the defendants' motion to strike as to them.

Judge Irving interpreted the saving provision in Code § 15.2-2204(A) to apply only "when 'the *newspaper fails* to publish the notice or *publishes* the notice incorrectly.'" Based on the evidence at trial, she found that the Board was at fault for the failure to publish the

- 13 -

advertisement on November 28, not the *Post*. So the Board could not use the saving provision to excuse the failure to run the advertisement. She further found that the December 2 and December 5 advertisements were deficient because the proposed ordinances were not available for review by the public until December 7.

Judge Irving agreed with the defendants' argument that if a plaintiff had either "actual notice" of or actively participated in the public hearing, Code § 15.2-2204(B), then that plaintiff waived any objection to advertising deficiencies under subsection A. She thought that result was required by *Norfolk 102, LLC v. City of Norfolk*, 285 Va. 340 (2013), and *Drewry v. Board of Supervisors*, 84 Va. App. 479 (2025).[9] The plaintiffs had argued, by contrast, that the waiver provision in subsection B excused only the public body's failure to give the "written notice" to each adjacent landowner required by that subsection, not the separate requirement to properly advertise under subsection A. They also argued, unsuccessfully, for a narrower reading of *Norfolk 102* and *Drewry*.

Still, Judge Irving found that three of the ten plaintiffs with standing lacked "actual notice" of the December 12 public hearing: plaintiffs Ian Mirkes, Jose Medina, and Michael Donegan. Since those three plaintiffs had not waived their objections to the advertising deficiencies, all three ordinances were void ab initio. The trial court dismissed Counts II through VII without prejudice. The final order was made effective September 15, 2025.

The Board and the developers timely noted three separate appeals (Record Nos. 1584-25-4, 1590-25-4, and 1592-25-4). As oral argument was about to be scheduled in *Burke*, we granted the Board and developers' motion to consolidate and expedite their appeals and to pair them for argument with *Burke*. On November 17, 2025, we stayed execution of Judge

---

[9] The Supreme Court recently refused Drewry's petition for appeal. *See Drewry v. Bd. of Supervisors*, No. 250446 (Va. Jan. 13, 2026) (order).

- 14 -

Irving's judgment except to the extent it prohibited the Board and developers from engaging in land-disturbance or actual construction of the facilities pending appeal.

ANALYSIS

I. *One or more of the Oak Valley plaintiffs has standing to challenge all three rezonings (Assignments of Error 5, 6).*

"[A] two-prong test . . . determine[s] whether a person who does not have an ownership interest in the subject property has standing to challenge a zoning determination." *Anders Larsen Trust v. Bd. of Supervisors*, 301 Va. 116, 121 (2022).

> First, the complainant must own or occupy real property within or in close proximity to the property that is the subject of the land use determination, thus establishing that it has a direct, immediate, pecuniary, and substantial interest in the decision.
>
> Second, the complainant must allege facts demonstrating a particularized harm to some personal or property right, legal or equitable, or imposition of a burden or obligation upon the petitioner different from that suffered by the public generally.

*Id.* (quoting *Friends of the Rappahannock v. Caroline Cnty. Bd. of Supervisors*, 286 Va. 38, 48 (2013); *see also Morgan v. Bd. of Supervisors*, 302 Va. 46, 59 (2023) (applying test). "Complainants do not need to establish that the particularized harm has already occurred." *Anders Larsen*, 301 Va. at 121 (quoting *Friends*, 286 Va. at 49). "Once one complainant demonstrates standing for the relief requested, a court need not determine whether the other complainants have standing." *Zinner v. Wash. Gas Light Co.*, 85 Va. App. 220, 238 (2025).

In *Oak Valley I*, we agreed with the trial court that "at least" ten of the plaintiffs had alleged sufficient facts at the demurrer stage to show standing. 85 Va. App. at 390. Several lived on properties that either abutted the affected land or that lay less than 2,000 feet away. *Id.* Those plaintiffs also alleged sufficient facts to show concrete injury to themselves. *Id.*

Judge Irving likewise found here that "ten of the twelve [Oak Valley] Plaintiffs . . . provided credible testimony showing a substantial risk that they were not only located close to

- 15 -

the rezonings but faced a substantial risk of particularized harm as well." She added that the plaintiffs are "situated differently from the public as a whole and [therefore] . . . have standing to bring this suit." The threatened harms included "(1) decrease in property values; (2) noise, including operational noise, noise from generator testing, and construction noise; (3) visual impacts, including from light pollution and smoke; (4) potential impacts on water systems; (5) intrusions from power lines; and (6) increased traffic volume in the area."

The Board and the developers argue that the trial court erred in its standing analysis because it treated the three rezonings as if they were a single rezoning, enabling a plaintiff who lives close to any one of them to challenge all three. "[I]n determining whether the facts in the record establish [a] landowner's standing, we 'accord[] a presumption of correctness to the circuit court's factual findings.'" *Zinner*, 85 Va. App. at 239 (third alteration in original) (quoting *Prince William Bd. of Cnty. Supervisors v. Archie*, 296 Va. 1, 9 (2018)). But whether the facts properly found by the circuit court establish standing "presents a question of law" that we review de novo. *Id.* (quoting *Anders Larsen*, 301 Va. at 122).

For the reasons set forth below, we agree with the Board and the developers that a plaintiff who has standing to challenge a *nearby* rezoning does not automatically have standing to challenge legally independent rezonings located further away. But we disagree with them that none of the Oak Valley plaintiffs has standing. Viewing the evidence in the light most favorable to the plaintiffs who prevailed below, we find that one or more plaintiffs established their standing to challenge all three rezonings.

A. *The rezonings cannot be grouped together to create standing.*

The trial court erred in aggregating the three rezonings, allowing a plaintiff with standing to challenge the nearest rezoning to also challenge the other two. The trial court reasoned that the Board and the developers acted "in tandem" when processing the three rezoning applications.

- 16 -

The court said that it need "only measure the distance from each of the Plaintiffs' properties to the edge of the Digital Gateway rezoning area as a whole." That was error. Though the three rezonings proceeded on parallel tracks procedurally, they were processed and approved as separate applications and resulted in three separate and independent ordinances.

Treating the three separate rezonings as if they were one would sidestep the first requirement of the *Anders Larsen* test. A challenger "must own or occupy real property within or *in close proximity to the property* that is the subject of the land use determination." *Anders Larsen*, 301 Va. at 121 (emphasis added) (quoting *Friends*, 286 Va. at 48). Landowners residing near one rezoning are not necessarily close to another. And "a litigant cannot, 'by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him.'" *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 301 (2022) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 n.5 (2006)).[10]

*DaimlerChrysler* offers a helpful analogy. The local-taxpayer plaintiffs there argued that because they had standing to challenge local-tax benefits offered to DaimlerChrysler, they also had standing to challenge State-tax benefits for which they would not otherwise have had standing under federal precedent. The plaintiffs reasoned that, under the *Gibbs* line of authority, because the district court had subject-matter jurisdiction over the State tax-benefits claim, which "derive[d] from a common nucleus of operative fact" as the local tax-benefits claim, they had

---

[10] No Virginia appellate authority has addressed whether a plaintiff with standing to challenge one of several legally distinct but simultaneously enacted zoning ordinances has standing to challenge the others. In the absence of controlling Virginia precedent, our appellate courts have often considered federal standing cases as persuasive authorities. *See, e.g.*, *Layla H. v. Commonwealth*, 81 Va. App. 116, 135 (2024). But not always. *See Howell v. McAuliffe*, 292 Va. 320, 331 (2016) (finding the parties' "battery of federal citations addressing the standing doctrine" inapposite in a case "brought by Virginia citizens against the Governor of Virginia and other state officials in the Supreme Court of Virginia, alleging violations of the Constitution of Virginia"); *Hawkins v. Grese*, 68 Va. App. 462, 480 (2018) ("The Commonwealth's third party standing exceptions are much narrower than those found in the federal system.").

derivative standing to prosecute both claims. *DaimlerChrysler*, 547 U.S. at 350-51 (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). The Supreme Court disagreed, holding that federal courts may not exercise subject-matter jurisdiction under *Gibbs* over any claim for which the plaintiff does not independently have standing. *Id.* at 351-52. As the Court put it, "standing is not dispensed in gross." *Id.* at 353 (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

The trial court's contrary conclusion here is not supported by the authority it cited, *Emig v. American Tobacco Co.*, 184 F.R.D. 379 (D. Kan. 1998). The *Emig* court held that the named class representatives in that smokers' class action had standing and were typical of the class. *Id.* at 386. The plaintiffs alleged that the tobacco-company defendants conspired with each other "to manipulate the nicotine content in cigarettes and conceal and suppress information regarding the addictive properties of nicotine." *Id.* The district court reasoned that if those conspiracy allegations were proven, the defendants who conspired would be jointly and severally liable for a smoker's damages even if the class representatives did not smoke each of the defendants' brands. *Id.* Unlike in *Emig*, however, there is no conspiracy or concert-of-action theory here to bestow standing on each plaintiff to invalidate a distant rezoning that will not injure that plaintiff.

Focusing on the element of redressability yields the same conclusion. "[A] plaintiff must demonstrate standing for each claim he seeks to press," as well as "'for each form of relief sought.'" *DaimlerChrysler*, 547 U.S. at 352 (quoting *Friends of Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). "'Standing is limited to injuries where a court may reasonably be expected to find a remedy,' and that remedy . . . must be 'enough to . . . address the harms of the named defendants.'" *Layla H. v. Commonwealth*, 81 Va. App. 116, 135 (2024) (quoting *Philip Morris USA, Inc. v. Chesapeake Bay Found., Inc.*, 273 Va. 564, 579 (2007)). A landowner who is not injured by a rezoning located far away lacks a redressable

injury. That standing problem is not solved simply because the landowner lives near a different rezoning that injures him.

   B. *One or more Oak Valley plaintiffs showed standing to challenge all three rezonings.*

   Although we reject the standing-in-gross theory applied by the trial court, we find nonetheless that the record supports the trial court's factual finding that one or more of the Oak Valley plaintiffs proved both proximity and injury sufficient to confer standing to challenge all three rezonings.[11]

   *Compass*

   Three plaintiffs—Cameron Rohrer, Gabrielle Pyle and Michael Donegan—testified that their properties are located 130 feet, 1,650 feet, and 1,820 feet, respectively, from the Compass rezoning. Rohrer's proximity to Compass was further shown because his name and address appear on the developer's "Adjacent Owners Property List" for Compass, which the Board and the developers themselves introduced into evidence. In it, Compass's representatives certified to the Board that every property on that list was "within 500 feet" of the Compass rezoning.

   That exhibit also showed the name and property address for plaintiffs Jeffrey Jensen, Jose Medina, John Bradshaw, and a property owned by plaintiff Oak Valley Homeowners Association. Thus, the proximity requirement for Jensen, Medina, Bradshaw, and Oak Valley was satisfied because the evidence showed that each was located within 500 feet of the Compass rezoning. *See Commonwealth v. Cady*, 300 Va. 325, 329 n.2 (2021) ("Our sufficiency review 'is not limited to the evidence mentioned' by counsel." (quoting *Perry v. Commonwealth*, 280 Va. 572, 580 (2010))).

---

[11] The Board and the developers do not contest our holding in *Oak Valley I* that "although it is uncertain precisely where in the subject area any eventual data center might be sited, the proximity analysis is concerned only with 'proximity to the property that is the subject of the land use determination.'" 85 Va. App. at 390 (quoting *Morgan*, 302 Va. at 59).

The evidence also sufficed to show that each of these seven plaintiffs would suffer individualized injury from the Compass rezoning—injury that is different in kind from that experienced by the public at large. Rohrer, who works as a technical leader for a civil-engineering firm, testified that he has a "big concern" about data-center noise, which has been "well-documented." Noise is problematic both during construction, which would take "years and years," as well as when the data center goes into "24-7 operation," with noise generated by "electrical substations" and "air-handling" equipment. The noise would "directly impact" his family because his wife homeschools their six children, and "most of [his] family is at . . . home all the time." His family currently enjoys "peace and tranquility" on the property, where it is "very quiet." So data-center construction and operation "would have a great impact on [their] quality of life."

Rohrer further testified that the noise would "decimate" the wildlife his family enjoys seeing on their property, including "deer, turkey, fox, rabbits, owls, hawks, even bear." He said that "the numbers and the observability of those kinds of wildlife will diminish, which has a direct impact on the quality of the home education [he and his wife] can provide" their children. He also worries about adverse water-quality impacts to his well. He said that the "increases [in] impervious areas" would "reduce[] infiltration into the ground that could have a direct impact on the water table" and that "run off from construction materials and other kinds of toxins" could infiltrate "the aquifers that feed [his] well." For all those reasons, Rohrer worries that his property value will diminish.

Donegan testified that he is familiar with data centers from his 23 years of service as an "IT professional" in the United States Army, having "operated, installed and maintained data centers in a tactical environment." The HVAC systems needed to cool a data center, "operating

all the time," would generate substantial noise. And the backup generators needed for data centers are "extremely noisy" and can "billow black smoke."

Donegan testified that having data centers near his property would harm his quality of life. His family moved to that part of Virginia for the "peace and quiet" of a "rural setting," not a noisy one. They spend "a lot of time outside." His property would be "up front and close" to an open construction site for "10 to 15 years," a prospect that is "not appetizing at all." The road "visible from [his] backyard" cannot "accommodate the throughput traffic" of all the "rolling trucks" during construction. And then "the noise from the day-to-day operations 15 years on after this thing is completed is going to remain." Donegan added that the view from his property—one can currently see "for miles" from the backyard—would be marred by data centers.

Jensen testified that data-center construction would have "multiple impacts" on his property. A "very tall" data center next door would cause "a huge visual impact." His family's tranquility would be disturbed by "security lighting and then the noises that are going to be experienced on a 24-hour basis for chillers and coolers that are associated with the project." He also worries that the data center's lighting, noise, and vibrations would disturb the "25 beehives" he operates on his property as part of a "honey bee apiary." Like Rohrer, he fears that runoff from increased impervious surfaces would damage the drinking-water well on which his family depends. He said that he and his wife moved to the Rural Crescent in 2008 to live in "a protected rural area" in retirement, not to live next door to a data center. Jensen also testified to his fear that having a data center close by would reduce his property value.

Pyle testified that she is "very concerned" about having a data center nearby because her autistic son is extremely sensitive to noise; she fears the sounds will "upset him very much." Swimming in their outdoor pool is one of his few pleasures in life, and Pyle believes that the

noise will prevent him from doing that, requiring her family to move. She also fears that her property value will decline—"Because who wants to live next to that?"

Medina testified that he bought his property to fulfill his dream to raise polo horses. Medina's two polo horses "are very sensitive" to noise, and he worries that data-center construction and operation will disturb them. Like Jensen and Pyle, Medina testified that data-center construction would adversely impact his property value.

Bradshaw too was concerned about data-center "noise pollution." Aware of noise complaints by landowners who live next to data centers elsewhere, he fears that he will be subject to "never-ending noise," as well as reduced property value.

The evidence at trial showed similar impacts to the property owned by the Oak Valley Homeowners Association. Mac Haddow, the association president, testified to his concerns that nearby data centers would adversely affect "the quality of life, the value of our properties, [and] the character of the community." The adverse effects would include "construction traffic . . . when [the data centers are] initially built, then also to service them," and "the hundreds of generators that would be required to" support them. Data-center development, he said, would significantly devalue the property owned by the association.

*DG South*

Plaintiff Stephanie Chartrand testified at trial to her similar concerns about living near DG South. Her property is 986 feet from the DG South rezoning. Like the other plaintiffs, she too is concerned about noise, both during construction and then "once the buildings are operational." She also worries that data centers will spoil the view east from her property in the

wintertime. And like the other plaintiffs, Chartrand fears that having data centers nearby will harm her property value.[12]

*DG North*

Although Medina did not know which rezonings were near him, the map appended as attachment B to the Board and developers' opening brief here shows that his property is close to *both* the Compass and DG North rezonings:



The Board and developers admitted that Medina's property lies "roughly 1,300 feet from the nearest property line for Digital Gateway North," Op. Br. 66; Reply Br. 18, making him "proximate to [DG] North," Reply Br. 18.[13] That is close enough to satisfy the proximity requirement. And for the same reasons that Medina established standing to challenge the

---

[12] The challenge to the DG South rezoning is no less valid because Chartrand is the only plaintiff with standing to complain about it. "[W]hen 'one complainant demonstrates standing for the relief requested, a court need not determine whether the other complainants have standing.'" *Oak Valley I*, 85 Va. App. at 390 n.3 (quoting *Zinner*, 85 Va. App. at 238).

[13] We treat appellants' statements about the Oak Valley plaintiffs' proximity to the various rezonings as factual concessions. *See, e.g.*, *Mintbrook*, 76 Va. App. at 293 (holding that appellate courts may accept concessions of fact, "including concessions made for the first time on

Compass rezoning based on his reasonable fear of reduced property value and the threat to his horses, Medina likewise has standing to challenge the DG North rezoning.[14]

\* \* \*

The evidence summarized above amply supports the trial court's finding that these eight plaintiffs showed proximity and concrete injury, different in kind from the public at large, to establish their standing. Each testified to significantly more threatened injury than the "temporary harms" we found sufficient to support standing in *Zinner*—a one-week period in which one of the plaintiffs would not be able to access her driveway, during working hours, when the challenged natural-gas pipeline would be laid next to her property. 85 Va. App. at 239-41. We said that "[l]osing access to one's driveway during the workday for up to a week qualifies as a burden particular to [the plaintiff] that is 'different from that suffered by the public generally.'" *Id.* at 241 (quoting *Friends*, 286 Va. at 48). The threatened injury shown here by these eight plaintiffs is both more severe and permanent.

The noise and viewshed harms described by these plaintiffs are analogous to the harm found sufficient to confer standing on the plaintiffs who challenged the large distribution facility in *Morgan*. 302 Va. at 60-62. Those harms included "a dramatic increase in traffic" and "chronic, excessive noise from truck back-up alarms; and the localized effect of night-sky light pollution from the taller lighting poles to be used in the facility's parking areas." *Id.* at 60.

---

appeal"). Although they moved on January 5, 2026 to strike the map and other "factual assertions" from the Board and developers' opening brief, the Oak Valley plaintiffs withdrew that motion at oral argument.

[14] The Board and the developers argue for the first time on appeal—without citation to the record—that "a dense treeline separates Medina's property from the Digital Gateway North plot." Op. Br. 66; Reply 18. But as they failed to mention this argument in the trial court, we do not consider it. Rule 5A:18.

- 24 -

We find unpersuasive the Board and the developers' response that mitigation measures should assuage the plaintiffs' concerns about noise and viewshed impairment. The developers' proffers limit noise emissions from the data centers—as measured at neighboring residences—to 60 decibels during the daytime and 55 at night. The developers' presentation to the Board showed that the noise level of "[w]oodland" is about 15 decibels, while "[c]onversational [s]peech" clocks in at about 60 decibels. Thus, the developers' own presentations showed that the plaintiffs faced a multifold increase in noise levels at their homes.[15] And the proffered caps do not apply to noise generated by "construction" or "demolition" activities, which could exceed those limits.

The Board staff also revealed at the public hearing that it was unable to review the developers' noise-mitigation proffers because staff lacked in-house expertise and would have needed to hire an outside consultant. And although the developers performed studies for viewshed impacts on the Manassas Battlefield Park, Supervisor Weir apologized at the public hearing to various "close-in neighborhoods," including Oak Valley, because no noise or viewshed studies had been conducted to determine the adverse impacts on them. *Cf. Seymour v. Roanoke Cnty. Bd. of Supervisors*, 301 Va. 156, 169 (2022) (finding standing where, "[a]lthough the Board of Supervisors imposed several conditions on the special use permit . . . , these conditions did not address the alleged harm created by the traffic on the easement"); *Zinner*, 85 Va. App. at 240 ("Even when a construction permit can successfully mitigate most construction impacts, it does not necessarily mitigate all impacts.").

The Oak Valley plaintiffs also supported their claim that the construction of a data center near their homes would reduce their property values. In *Anders Larsen*, the Court found the

_____

[15] Although multiple plaintiffs testified that it was very quiet outside their homes, the record does not include data showing the average decibel level.

plaintiffs' claims "entirely plausible that operating a [drug] treatment center in an otherwise entirely residential neighborhood can lead to diminished value of the immediate neighbors' properties." 301 Va. at 122. The plaintiffs' claims here are just as reasonable. Indeed, we held in *Oak Valley I* that these same plaintiffs sufficiently alleged at the demurrer stage that data-center construction would reduce their home values. 85 Va. App. at 391-92. We said that they "plausibly asserted that 'any reasonable purchaser of real estate in close proximity to the Digital Gateway area, such as the residences of the Plaintiffs, necessarily would take into account the adverse impact of nearby data centers in determining the price he or she is willing to pay.'"[16] *Id.* at 391.

In sum, given the extensive trial record, the trial court did not err in finding that one or more of these eight plaintiffs adequately established both proximity and individualized injury sufficient to confer standing to challenge each rezoning.[17]

---

[16] The Board and the developers introduced into evidence defendants' Exhibit 43, the second amended complaint in *Oak Valley I.* Paragraph 90 of that complaint recited facts showing that data-center development would harm the plaintiffs' property values:

> Real estate agents familiar with the residential real estate market in the Gainesville/Bristow/Haymarket area are experiencing buyer resistance when considering listings of homes, like those of Plaintiffs, located in close proximity to the proposed data centers. Plaintiff Oak Valley is already aware of two situations in its community in which a potential buyer chose another community, not near the Digital Gateway, over Oak Valley because of the proximity of Oak Valley to the Digital Gateway CPA Study Area. A decline in the residential real estate values also means a decline in the price Oak Valley could command for any of its HOA Parcels.

Because we find the other record evidence listed above sufficient to support the plaintiffs' claims of reduced property value, we do not reach whether the defendants are bound by those factual statements because the defendants themselves introduced the complaint into evidence without limitation.

[17] Those "that have standing under this principle, moreover, retain it even if they cannot prove that following the proper procedure would have produced a different decision from the

*II. The Board's advertising was deficient (Assignments of Error 1-3).*

As set forth in this section, the Court holds that none of the three public advertisements

for the Board's December 12, 2023 meeting satisfied the advertising requirements in

Code § 15.2-2204(A) and Prince William County Zoning Ordinance § 32-700.60.

> *A. The relevant advertising requirements are based on the statute and ordinance as of December 2023.*

The requirements in the statute and the ordinance were once the same but later diverged.

To understand how that happened, we start with the text of Code § 15.2-2204(A) as of July 1,

2012, when an amended and reenacted version of the statute took effect. The statute at that time

required a governing body that wanted to adopt or amend a zoning ordinance to advertise its

intention to do so, subject to the following constraints:

- The advertisement had to "contain a *descriptive summary* of the proposed action and a reference to the place or places within the locality *where copies* of the proposed plans, ordinances or amendments *may be examined*" (the "descriptive-summary requirement" and "where-to-review requirement").

- The advertisement had to be published "once a week for two successive weeks" in a locally available newspaper (the "two-successive-weeks requirement").

- "The term 'two successive weeks' . . . shall mean that such notice shall be published *at least twice* in such newspaper *with not less than six days elapsing between the first and second publication*" (the "at-least-twice requirement" and "six-days-in-between requirement").

- The advertisement had to "specify the time and place of hearing at which persons affected may appear and present their views, *not less than five days nor more than 21 days* after the second advertisement appears in such newspaper" (the "hearing-not-less-than-five-days-after requirement").

2012 Va. Acts ch. 548 at 1076 (Code § 15.2-2204(A)) (emphases added).

---

governing body." *Morgan*, 302 Va. at 66. Given that the December 13, 2023 vote was four to three with one abstention, however, it is unclear whether the Board would have approved the rezonings if the question had been postponed to a later hearing date to satisfy the advertising rules. Chairman Ann Wheeler cast the deciding vote, and her term ended in 2023. At least one supervisor suggested at the December 12 meeting that the vote was being rushed through so Chairman Wheeler could vote on the rezonings before the board of supervisors was reconstituted in the new year. *See* Pl. Ex. 18 at 26:09:32 (Statement by Supervisor Yesli Vega).

Parallel requirements appeared in the 2018 version of Prince William County Zoning Ordinance § 32-700.60, the version still in effect as of the December 2023 hearing at issue here:

- The where-to-review requirement: "Notice of amendments . . . need not be advertised in full, but may be advertised by reference, provided that the place where copies of such amendments . . . may be viewed shall be included in the notice."

- The two-successive-weeks and six-days-in-between requirement: "Notice of a zoning map amendment . . . shall be published once a week for two successive weeks (with not less than six days elapsing between the first and second publication) . . . ."

- The hearing-not-less-than-five-days-after requirement: "Notice shall specify the time and place of the public hearing, which shall be held not less than five days nor more than 21 days after the second advertisement shall have appeared."

Prince William Cnty. Zoning Amend. #DPA2017-00006 (May 15, 2018), https://perma.cc/R6ZD-BQRS.  Similar to the statute, the ordinance provided that "[t]he Planning Commission shall not recommend, nor the Board of County Supervisors approve any amendment . . . until such notice is given."  *Id.*

In 2022, the General Assembly amended Code § 15.2-2204(A) (effective July 1, 2022), creating a saving provision when a locality had "submitted a correct and timely notice request" to advertise but the newspaper failed to publish it (or published it incorrectly) (the "newspaper-failed-to-publish saving provision"):

> In any instance in which a locality has submitted a correct and timely notice request to such newspaper and the newspaper fails to publish the notice, or publishes the notice incorrectly, such locality shall be deemed to have met the notice requirements of this subsection so long as the notice was published in the next available edition of a newspaper having general circulation in the locality.

2022 Va. Acts ch. 478 at 840. Proponents of the bill (H.B. 167) explained that localities should not be "punished because a newspaper is negligent"[18] or "the newspaper made a mistake."[19]

Also in 2022, the General Assembly tasked the Virginia Code Commission to convene a working group of stakeholders "to review requirements throughout the Code of Virginia for localities to provide public notice," inviting the working group to propose amendments addressing the "varying frequency for publishing notices" and "the number of days required to elapse between" such notices. 2022 Va. Acts chs. 129, 130. The working group submitted its report later that year.[20]

The 2023 General Assembly implemented most of the group's recommendations to facilitate "standardization of public notice requirements for certain intended actions." 2023 Va. Acts chs. 506, 507. The 2023 version of Code § 15.2-2204 is the one that applied to the Board's December 2023 meeting.

As relevant here, the 2023 bill eliminated the descriptive-summary requirement but kept the where-to-review requirement. It also kept the two-successive-weeks, at-least-twice, and six-days-in-between requirements. But the legislation replaced the hearing-not-less-than-

---

[18] House Comm. on Counties, Cities and Towns, Statement of Del. Williams Graves at 9:19:08 a.m. (Jan. 28, 2022), https://tinyurl.com/4vbu57nn.

[19] Senate Comm. on Local Government, Statement of Del. Ransome at 22:10 (Feb. 21, 2022), https://tinyurl.com/4ppdxe8v.

[20] *See* RD269—Virginia Code Comm'n, *A Review of Localities' Requirements to Provide Public Notice of Intended Actions and Events and Recommendations for Uniformity and Efficiency* (Nov. 1, 2022), https://perma.cc/TY3T-SPUW.

five-days-after requirement with a requirement that "the first notice appear[] no more than 14 days before the intended adoption."[21]

The Board, however, did not make corresponding amendments to § 32-700.60 of its zoning ordinance until 2024.[22] *See* note 27 *infra*. So to comply with *both* the statute and the ordinance, the Board had to:

---

[21] The 2023 amendment to Code § 15.2-2204(A) provided, in relevant part, as follows:

> A. Plans or ordinances, or amendments thereof, recommended or adopted under the powers conferred by this chapter need not be advertised in full, but may be advertised by reference. Every such advertisement shall ~~contain a descriptive summary of the proposed action and a reference to~~ *identify* the place or places within the locality where copies of the proposed plans, ordinances or amendments may be examined.

> The local planning commission shall not recommend nor the governing body adopt any plan, ordinance or amendment thereof until notice of intention to do so has been published once a week for two successive weeks in some newspaper published or having general circulation in the locality*, with the first notice appearing no more than 14 days before the intended adoption*; however, the notice for both the local planning commission and the governing body may be published concurrently. The notice shall specify the time and place of hearing at which persons affected may appear and present their views~~, not less than five days nor more than 21 days after the second advertisement appears in such newspaper~~. . . . As used in this subsection, "two successive weeks" means that such notice shall be published at least twice in such newspaper, with not less than six days elapsing between the first and second publication. In any instance in which a locality has submitted a correct and timely notice request to such newspaper and the newspaper fails to publish the notice, or publishes the notice incorrectly, such locality shall be deemed to have met the notice requirements of this subsection so long as the notice was published in the next available edition of a newspaper having general circulation in the locality. After enactment of any plan, ordinance or amendment, further publication thereof shall not be required.

2023 Va. Acts chs. 506 at 1008, 507 at 1040.

[22] As the Board and developers put it, the Board "had yet to update its ordinance to match the amended state code." Reply Br. 4.

- Run ads "for two successive weeks," Code § 15.2-2204(A) (Supp. 2023); PWC Ord. § 32-700.60 (2018) (same).

- "[I]dentify the place or places within the locality where copies of the proposed plans, ordinances or amendments may be examined," Code § 15.2-2204(A) (Supp. 2023); *accord* PWC Ord. § 32-700.60 (2018) ("the place where copies of such amendments . . . may be viewed shall be included").

- Run the first ad "no more than 14 days before the intended adoption," Code § 15.2-2204(A) (Supp. 2023), a shorter span than the up-to 28 days permitted by PWC Ordinance § 32-700.60 (2018).

- Have "not less than six days elapsing between the first and second publication," Code § 15.2-2204(A) (Supp. 2023); PWC Ord. § 32-700.60 (2018) (same).

- And hold the hearing "not less than five days . . . after the second advertisement," PWC Ord. § 32-700.60 (2018).

B.  *The Board failed to comply with the advertising requirements.*

The Board intended to meet those milestones.  It planned for the first ad to run in the *Post* on November 28 (14 days before the December 12 hearing) and for the second one to run on December 5 (more than 6 days later and 7 days before the hearing).  The Board's clerk emailed the *Post* shortly after noon on Monday, November 20, submitting the requested ad and the requested run dates.  The *Post* replied two hours later, noting that the cost would be $7,509.48, advising that the ads "will not run unless they are scheduled and submitted."  Two minutes later, the *Post* sent another email, warning that it needed confirmation by 3:00 p.m. the next day.  The clerk did not respond by that deadline.

Judge Irving found that the ads did not run on those requested dates because the clerk failed to confirm the publication request.  Although the Board's clerk asked the *Post* to provide an affidavit admitting that the *Post* was responsible for the failure, the *Post* declined.  Judge Irving noted, "All three members of the *Washington Post* staff deposed in this case indicated that they would not send an ordered ad out for publication unless the client sent confirmation that the proof was correct."  The Oak Valley plaintiffs also pointed to other email exchanges in which the

*Post* had clearly identified by email to the clerk when a requested ad had been submitted correctly and accepted for publication, and when it had not.  Judge Irving's factual finding that the Board, not the *Post*, was responsible for the failure to advertise on November 28 is thus "well-supported by credible evidence and will not be disturbed on appeal."  *Thomas v. Nordstrom Pentagon City/Nordstrom*, 22 Va. App. 626, 633 (1996).

Its advertising plans disrupted, the Board pressed ahead with the scheduled hearing anyway, running three ads in the *Post* on December 2, December 5, and December 9, 2023.  The Board and the developers argue that those publications satisfied the advertising requirements.  Oak Valley disagrees.  We examine those claims in turn.

### 1.  *The newspaper-failed-to-publish saving provision is inapplicable.*

The Board and the developers seek shelter in the saving provision in Code § 15.2-2204(A).  They claim that the Board met the terms of the statute because it "submitted a correct and timely notice request to such newspaper and the newspaper fail[ed] to publish the notice," Code § 15.2-2204(A), allowing the Board to publish the first ad on December 2.  They argue that "fails to publish" means simply that the newspaper did not publish as requested, not that it was negligent in doing so.  The saving provision, they say, "is agnostic" about who is "at fault" for the failure to publish.  The Oak Valley plaintiffs disagree, arguing that the saving provision does not apply unless the Board is blameless and the newspaper is at fault for the failure to publish.  They argue that the Board was at fault for not confirming the ad as the *Post* had requested.

The construction of the statute presents a pure question of law that we review de novo.  *Oak Valley I*, 85 Va. App. at 392.  But the trial court's finding that the Board, not the *Post*, was at fault for failing to publish the ad is a finding of fact.  "Under settled law, a trial court's finding of fact is reviewed 'with the highest degree of appellate deference,' and will be disturbed only if it

was plainly wrong or without evidence to support it[.]" *Wilkins v. Commonwealth*, 64 Va. App. 711, 719 (2015) (quoting *Thomas v. Commonwealth*, 48 Va. App. 605, 608 (2006)), *aff'd*, 292 Va. 2 (2016).

The saving provision in Code § 15.2-2204(A) cannot help a locality unless (1) the locality submits "a correct and timely notice request," and (2) "the newspaper fails to publish the notice, or publishes the notice incorrectly." Those requirements go hand in hand. And the Board failed to satisfy them.

The Board did not submit a "correct and timely" request to the *Post* because—as Judge Irving found—the Board did not respond in time to the *Post*'s request to confirm the ad. So the *Post* was not at fault for failing to publish the ad, the Board was. The statutory phrase "fails to publish," in the context of not publishing despite a "correct and timely" request, is best understood to require some sort of fault or mistake by the newspaper; the newspaper must "neglect to do something." *Fail*, *Webster's Third New International Dictionary Unabridged* (2002). That did not happen here.[23]

### 2. The first two advertisements violated the where-to-review requirement.

The ads that ran on December 2 and 5 violated the where-to-review requirement. Judge Irving found that the Board did not make the draft ordinances available in its clerk's office "until December 7, 2023," after the first two ads had already run. The clerk of the Board testified without contradiction that she received the "proposed resolutions and ordinances" for the first time on December 7, when they were transmitted to her as part of the agenda package for the Board's December 12 meeting.

---

[23] Because the Board cannot avail itself of the newspaper-failed-to-publish saving provision in Code § 15.2-2204(A), we need not reach its claim that Ordinance § 32-700.60 (2018) should be read to incorporate the saving provision. We also need not consider whether the saving provision is inapplicable because the replacement ad did not appear "in the next available edition" of the *Post*, Code § 15.2-2204(A), but appeared four days later.

The Board and the developers did not challenge that factual finding on brief, though they characterized it euphemistically by saying that the required "materials were fully available on December 7." Op. Br. 13. They reversed course at oral argument, however, claiming that the zoning amendments and the proffers were available for review in the clerk's office on December 2. Their counsel cited the trial record at pages 77072-76.

That part of the record does not support counsel's assertion and does not rebut the clerk's testimony. Moreover, Kara Klaas testified at trial that she visited the clerk's office on December 4, 2023, showed the deputy clerk the December 2 newspaper ad, and asked to see the documents referenced in the ad. The deputy clerk and the clerk both told her that the documents referenced in the ad "would not be available until December 7th." We therefore credit Judge Irving's factual finding as well supported by the record.

We reject the Board's response (joined by its amici) that the where-to-review requirement is satisfied by telling citizens where the draft ordinance will *eventually* be available for review. The requirement to tell citizens where the required documents "may be examined," Code § 15.2-2204(A) (Supp. 2023), and where "copies . . . may be viewed," PWC Ord. § 32-700.60 (2018), means that the text must be available when the ad runs.

Recall that both the statute and the ordinance permit the locality to advertise the zoning amendments "in full" or "by reference." Code § 15.2-2204(A) (Supp. 2023); PWC Ord. § 32-700.60 (2018). The required records obviously must exist to be included in the advertisement "in full." As Judge Irving correctly observed, "the full text of the proposed zoning ordinance or amendment would necessarily need to be available on the date of the first advertisement." The option to advertise "by reference" simply saves the locality from having to publish the language in full for ordinances, like these, that are quite lengthy. Nothing in the statute suggests that the option to publish by reference excuses the locality from having the text

- 34 -

in hand when the ad appears. It would be anomalous if the governing body could skirt that requirement using an advertisement that refers the reader to a place where the required documents cannot be found.

Noting that the where-to-review requirement applies only to the proposed "plans, amendments, and ordinances," the appellants' amici misstate the record in claiming that "the trial court dinged the County because it did not have unrequired, supplementary documents, such as staff reports available" when the advertisements were published. Not so. The trial court's opinion correctly read this requirement to apply only to the "plans, ordinances and amendments [the localities] intend to adopt."[24]

We likewise reject the Board and the developers' argument that it sufficed that the developers' "applications themselves were available both online and at the County's planning office throughout the public review process." For one thing, the advertisement directed readers to review the documents "in the office of the Clerk of the Board," not in the planning office. For another, the statute required the advertisement to say where the proposed "ordinance" and "amendments" could be reviewed, not the developers' applications. Code § 15.2-2204(A) (Supp. 2023).[25] The advertisements failed those requirements because the proposed rezoning ordinances were not available when the first two ads appeared.

---

[24] Proffers that have been accepted become "part of the zoning ordinance" itself. *Jefferson Green Unit Owners Ass'n v. Gwinn*, 262 Va. 449, 458 (2001). Although proposed proffers must therefore be available for public review when the ordinance is advertised under Code § 15.2-2204(A), that requirement does not prohibit amended proffers. Once there has been proper "public notice as required by § 15.2-2204," a public body "may make appropriate changes or corrections in the ordinance or proposed amendment." Code § 15.2-2285(C). The governing body may also "accept amended proffers once the public hearing has begun if the amended proffers do not materially affect the overall proposal." Code § 15.2-2303(A).

[25] Similarly, § 32-700.60 of the ordinance required the advertisement to say where the zoning "amendments" could be reviewed.

The drafting history of the 2023 amendment to Code § 15.2-2204 confirms that the proposed ordinance and amendments must exist when the advertisements are published. When the legislature deleted the descriptive-summary requirement in Code § 15.2-2204(A), it amended Code § 15.2-2285(C) to say that "no land may be zoned to a more intensive use classification than was contained in the *documentation made available for examination pursuant to subsection A of § 15.2-2204* without an additional public hearing." 2023 Va. Acts chs. 506 at 1008, 1010, 507 at 1040, 1042 (amended language italicized). In other words, the "documentation" must be "made available for examination" when the advertisements run.[26] We agree with Judge Irving's observation that "the removal of the 'descriptive summary' makes it all the more important that affected citizens be able to access proposed zoning ordinances or amendments and decide whether they intend to participate in a public hearing."

We reject the Board's argument that it can delay releasing the text of a proposed zoning ordinance until the agenda package is provided to Board members for the public meeting. To be sure, the Virginia Freedom of Information Act requires that "[a]t least one copy of the proposed agenda and all agenda packets and, unless exempt, all materials furnished to members of a public body for a meeting shall be made available for public inspection at the same time such documents are furnished to the members of the public body." Code § 2.2-3707(G). That requirement shines daylight on the legislative process by ensuring that the public has access to the agenda package at the same time as board members.

---

[26] *Accord* Senate Comm. on Local Government, Statement of Aimee Seibert at 20:47 to 21:05 (Jan. 23, 2023) (explaining that while the descriptive-summary requirement would be removed, all the information would still be available online and "also you can still have it and go pick it up in person"), https://tinyurl.com/mvkbb8mp. As one sponsor said on the Senate floor, the public notice would not have the details of the proposal but would "tell you where to get the details and be available to the public that way." Senate Proceedings, Statement of Sen. Edwards at 1:05:08 to 1:05:20 p.m. (Jan. 25, 2023), https://tinyurl.com/dbz2n6xb.

But that language does not negate the independent advertising requirements in Code § 15.2-2204(A). Under the Board's reasoning, a board chair could wait until the day before the public meeting to make a proposed zoning ordinance or amendment available to other board members and the public. The Board's interpretation would invite sandbagging and thwart the where-to-review and two-successive-weeks notice requirements. It would flout the principle that "Virginia's zoning statutes are designed to prevent zoning changes from being made 'suddenly, arbitrarily, or capriciously.'" *Glazebrook v. Bd. of Supervisors*, 266 Va. 550, 555 (2003) (quoting *Bd. of Supervisors v. Snell Constr. Corp.*, 214 Va. 655, 658 (1974)).

### 3. The second ad also failed the six-days-in-between requirement.

If the December 5 advertisement is considered the "second" publication under the statute and the ordinance, it failed the six-days-in-between and two-successive-weeks requirements. That advertisement ran only three days after the December 2 advertisement.

### 4. The third ad violated multiple requirements.

The Board and the developers attempt to satisfy the six-days-in-between requirement by arguing that the third advertisement, which ran on December 9, should be considered the "second" one, which ran more than six days after the December 2 advertisement. They reason that the statute permits *more* than two ads because "notice shall be published *at least twice*." Code § 15.2-2204(A) (Supp. 2023) (emphasis added). If a locality had chosen to advertise every day during the successive two-week period, they posit, surely the six-days-in-between requirement should be measured by the minimum of what would have been required if only two ads had run. Appellants' amici repeat that argument, adding that it would be "absurd" to punish localities for providing more notice than is statutorily required.

While that argument has logical force, we need not reach it because the December 9 advertisement itself failed to comply with other requirements. By the time that ad appeared, the

- 37 -

rezoning ordinance was finally available for public review in the office of the clerk of the Board. But because the first two ads failed the where-to-review requirement, the third ad alone could not satisfy the two-successive-weeks requirement.

The December 9 ad was also defective because it ran only three days before the December 12 hearing. So even viewing the December 9 ad as the "second" advertisement, as the Board and developers urge, the ad ran too soon before the hearing date to satisfy the not-less-than-five-days-after requirement in § 32.700.60 of the ordinance. "When the County re-zoned . . . without complying with . . . its own ordinance, its action was arbitrary and capricious, and not fairly debatable, thereby rendering the re-zoning void and of no effect." *Renkey v. Cnty. Bd. of Arlington*, 272 Va. 369, 376 (2006).

We disagree with the Board and the developers that we should treat the ordinance's requirement of a hearing "not less than five days . . . after" the second notice as preempted by the statute, which omitted that requirement. No conflict exists to warrant such preemption. A local zoning ordinance is preempted by the Virginia code only when "the ordinance and statute cannot coexist." *Bragg Hill Corp. v. City of Fredericksburg*, 297 Va. 566, 578 (2019). "If an enabling statute and an ordinance can both be given effect, we 'harmonize them and apply them together.'" *Id.* at 578-79 (quoting *W. Lewinsville Heights Citizens Ass'n v. Bd. of Supervisors*, 270 Va. 259, 266 (2005)). The ordinance's requirement that the public hearing take place no less than five days after the second public advertisement does not conflict with the 2023 version of Code § 15.2-2204(A). Indeed, the Board's initial advertising plan would have complied with both the statute and the ordinance. The Board simply failed to meet its own self-imposed advertising deadlines.[27]

---

[27] The advertising provisions in the statute and ordinance have changed some more since 2023. The 2024 amendment to Code § 15.2-2204(A) required the first ad to run "no more than 28 days before" and the second "no less than seven days before" the hearing. 2024 Va. Acts chs.

*C. The Board and the developers failed to show that the hearing date could not be postponed to properly advertise.*

Counsel for the developers claimed for the first time at oral argument here that § 32-700.43(2) of the Prince William County Zoning Ordinance prevented the Board from continuing the December 12 hearing date to readvertise, though counsel acknowledged that this claim is "not in the record." The ordinance provides that the Board has "one year from the date a zoning map amendment is initiated to act on the amendment unless the applicant requests or consents to action beyond such period." PWC Ord. § 32-700.43(2). Counsel implied that the developers did not consent to exceed the one-year period.

We find this argument to be without merit for two independent reasons. First, the argument is defaulted because it was neither raised below nor briefed here. *See* Rule 5A:18; 5A:20(e).

Second, the developers' claim that the hearing date could not be postponed cannot be squared with the plain language of the ordinance, which provides for the one-year review period to renew whenever the developer amends the application. *See* PWC Ord. § 32-700.43(2) ("[W]henever an applicant shall make a change in his application, the one-year time period shall run from the date the change is received by the Planning Director."). It is undisputed that all three developers changed their rezoning applications after the November 2023 Planning Commission hearing, filing their "5th submittal." Thus, under the plain language of the ordinance, the one-year period to act had renewed and was no impediment to postponing the hearing date, had the Board wanted to do so.

---

225, 242. A 2025 amendment shortened that seven-day period to five days. 2025 Va. Acts ch. 52. The Board solved the problem of having its ordinance diverge from the frequently amended statute by amending § 32-700.60 to simply track the requirements of Code § 15.2-2204(A). *See* Prince William Cnty. Ord. No. 24-75 at 32 (Nov. 19, 2024), https://perma.cc/JC5E-6LUT.

The Board and the developers argue that even if the hearing advertisements were deficient under subsection A of Code § 15.2-2204, the deficiencies were excused by the waiver provision in subsection B. They insist that all plaintiffs had "actual notice" of the December 12 hearing.

The landowners respond in two ways. First, they argue in cross-errors 1 and 2 that the actual-notice-waiver provision in subsection B excuses only the failure to give the "written notice" to affected and adjacent landowners that subsection B requires, not the locality's failure to advertise the hearing to the public in the manner required by subsection A. Second, even if the waiver provision in subsection B excuses advertising deficiencies under subsection A, they argue that "actual notice" means *actual knowledge* and that Judge Irving correctly found that plaintiffs Mirkes, Medina, and Donegan lacked actual knowledge of the December 2023 public hearing.

We agree with the Oak Valley plaintiffs' first argument and therefore do not reach the second one.[28] For the reasons set forth below, we find that the actual-notice-waiver provision in subsection B of Code § 15.2-2204 does not excuse advertising deficiencies under subsection A.

Our Supreme Court has consistently held that compliance with the advertising requirements of Code § 15.2-2204(A) and its statutory predecessor (Code § 15.1-431) is essential

---

[28] In deciding a case on the best and narrowest grounds, "we look for the best and *fewest* grounds on which to resolve [an] appeal." *Theologis v. Weiler*, 76 Va. App. 596, 603 (2023). No matter how we might decide whether *actual notice* means *actual knowledge*, we would still have to decide whether actual notice under subsection B waives advertising deficiencies under subsection A. We would have to do so even if we agreed with the landowners that *actual notice* means *actual knowledge* and further agreed with them that that Mirkes, Medina, and Donegan lacked actual knowledge of the public hearing. That is so because none of those three plaintiffs lives near DG South. The only plaintiff near that rezoning is Chartrand, and she knew about and actively participated in the public hearing. In short, our conclusion that actual notice of the public hearing does not waive advertising deficiencies under Code § 15.2-2204(A) makes it unnecessary to determine whether the Oak Valley plaintiffs had actual notice of the public hearing.

for a local governing body to have the power to enact a zoning ordinance. These cases predate and postdate the 1993 amendment, 1993 Va. Acts ch. 128, that added the actual-notice-waiver provision.

In *Town of Vinton v. Falcun Corp.*, 226 Va. 62 (1983), the Court held that a municipality could not circumvent the statutory prerequisites for enacting a zoning ordinance by using its charter powers to enact it on an "emergency" basis. *Id.* at 67. The Court described the statutory scheme "to enact a zoning ordinance or adopt an amendment to such an ordinance" as follows:

> First, the governing body must initiate the proposal by adopting a written resolution stating the underlying public purpose.
>
> Second, the proposal must be referred to the local planning commission for review.
>
> Third, the commission must give public notice . . . , conduct a public hearing, and report its recommendations to the governing body.
>
> Fourth, upon receipt of the commission's report, the governing body must give public notice and conduct its own public hearing.

*Id.* at 65-66 (citations omitted). "By complying with these procedures, the governing body acquires the same authority to act upon a zoning proposal as it has to act upon other legislative matters." *Id.* at 66.

In *City Council of the City of Alexandria v. Potomac Greens Associates Partnership*, 245 Va. 371, 377 (1993) (*Potomac Greens*), the Court held that the planning commission's failure to advertise a public hearing on a zoning amendment for "two successive weeks," as required by then-Code § 15.1-431—now Code § 15.2-2204(A)—rendered the adopted ordinance "void ab initio." *Id.* at 378.

That same year, the General Assembly added the actual-notice-waiver provision at issue here as the eighth and last paragraph of Code § 15.1-431. 1993 Va. Acts ch. 128. The text of

that provision has not been altered since, and it currently appears as the last paragraph of

Code § 15.2-2204(B).[29]

[29] Here is the actual-notice-waiver provision in context with the rest of the 1993 amendment, with paragraph numbers superimposed for ease of reference:

§ 15.1-431. Advertisement of plans, ordinances, etc.; joint public hearings; written notice of certain amendments. —

[1] Plans or ordinances, or amendments thereof, recommended or adopted under the powers conferred by this chapter need not be advertised in full, but may be advertised by reference. Every such advertisement shall contain a descriptive summary of the proposed action and a reference to the place or places within the county or municipality where copies of the proposed plans, ordinances or amendments may be examined.

[2] The local commission shall not recommend nor the governing body adopt any plan, ordinance or amendment until notice of intention so to do so has been published once a week for two successive weeks in some newspaper published or having general circulation in such county or municipality . . . . Such notice shall specify the time and place of hearing at which persons affected may appear and present their views, not less than six days nor more than twenty-one days after the second advertisement shall appear appears in such newspaper. . . . The term "two successive weeks" as used in this paragraph shall mean that such notice shall be published at least twice in such newspaper with not less than six days elapsing between the first and second publication.

[3] When a proposed amendment of the zoning ordinance involves a change in the zoning classification of twenty-five or fewer parcels of land, then, in addition to the advertising as above required, written notice shall be given by the local commission, or its representative, at least five days before the hearing to the owner or owners, their agent or the occupant, of each parcel involved,; to the owners, their agent or the occupant, of all abutting property and property immediately across the street or road from the property affected; . . . .

[4] When a proposed amendment of the zoning ordinance involves a change in the zoning map classification of more than 25 twenty-five but less than 500 parcels of land, then, in addition to the advertising as above required, written notice shall be given by the local commission, or its representative, at least five days before

Read in context with the rest of the statute, the actual-notice-waiver provision as enacted in 1993 applied only to the failure to give the required "written notice" to affected landowners, not to the failure to comply with the two-successive-weeks advertising requirements. The first two paragraphs of the code section addressed the advertising requirements, including the requirement to include "a descriptive summary of the proposed action" and to publish the advertisement in a newspaper "for two successive weeks." 1993 Va. Acts ch. 128 at 133. The advertising requirements did not use the phrase "written notice" (and never have). The third, fourth, and fifth paragraphs addressed the requirement to provide "written notice" to owners of affected property and adjacent property. The sixth paragraph preserved local ordinances adopted before 1974 from being invalidated "by reason of a failure to advertise or give notice" as required by the statute, as long as a public hearing had been conducted before adoption. Thus,

the hearing to the owner, owners, or their agent of each parcel of land involved. . . .

[5] Whenever the notices required hereby are sent by an agency, department or division of the local governing body, *or their representative,* such notices may be sent by first class mail . . . .

[6] The adoption or amendment prior to January 1, 1974, of any plan or ordinance under the authority of prior acts shall not be declared invalid by reason of a failure to advertise or give notice as may be required by such act or by this chapter, provided a public hearing was conducted by the governing body prior to such adoption or amendment. . . .

[7] After enactment of any such plan, ordinance or amendment, further publication thereof shall not be required.

[8] *A party's actual notice of, or active participation in, the proceedings for which the written notice provided by this section is required shall waive the right of that party to challenge the validity of the proceeding due to failure of the party to receive the written notice required by this section.*

1993 Va. Acts ch. 128.

the statute explicitly and repeatedly distinguished the "failure to advertise" from the failure to provide "written notice."

In 1994, the General Assembly added what is now subsection C to Code § 15.2-2204, requiring additional written notice to adjoining localities "within one-half mile" of the land at issue. 1994 Va. Acts ch. 774 at 1182. The legislature made clear that such additional notice was "in addition to the advertising and written notification as above required," *id.*, again distinguishing "advertising" from "written notice."

In 1996, the General Assembly added a 30-day statute of limitations for actions to enforce the advertising and written-notice requirements, again distinguishing the failure to advertise from the failure to give written notice:

> Every action contesting a decision of a locality based on a *failure to advertise* or *give notice* as may be required by this chapter shall be filed within thirty days of such decision with the circuit court having jurisdiction of the land affected by the decision.

1996 Va. Acts ch. 613 (emphases added). (That provision now appears as Code § 15.2-2204(E).)

In 1997, the General Assembly recodified Title 15.1 as Title 15.2, moving the provisions of Code § 15.1-431 to Code § 15.2-2204. The revisors divided the statute into subsections A through E, with subsection A addressing the advertising requirements and subsections B and C the written-notice requirements. 1997 Va. Acts ch. 587 at 1138-39. The actual-notice-waiver provision became the last paragraph of subsection B. *Id.* at 1139.

We disagree with the Board and the developers' suggestion that in retaining the phrase "written notice provided by this *section*," and not replacing it with "written notice provided by this *subsection*," the General Assembly intended for the waiver provision to encompass both the failure to properly advertise and the failure to give written notice. For one thing, the recodification reinforced the distinction between advertising and written notice by separating the advertising requirements in subsection A from the written-notice requirements in other

- 44 -

subsections. For another, the Code Commission made clear that the recodification in Code § 15.2-2204 made "[n]o substantive change in the law." Sen. Doc. 5, *Report of the Virginia Code Commission on the Recodification of Title 15.1* 605 (1997).

In 2003, the Supreme Court in *Glazebrook* strictly enforced subsection A's advertising requirements without regard to whether the plaintiffs had actual notice of the hearing. *Glazebrook* observed that the hearing required by subsection A provided "persons affected" the ability to "appear and present their views." 266 Va. at 555 (quoting Code § 15.2-2204(A)). "This language suggests that the intent of the statute is to generate informed public participation by providing citizens with information about the content of the proposed amendments and the forum for debate concerning those amendments." *Id.* The failure to include the descriptive summary thwarted that purpose, the Court said, rendering the ordinance "void *ab initio*." *Id*. at 554, 557.

Nothing in *Glazebrook* suggests that a zoning ordinance enacted in violation of the advertising requirements in subsection A would be valid—rather than void ab initio—if the plaintiff had actual notice of the hearing or had actively participated in it. The Court's decision not to mention that point is noteworthy because the parties contested that issue on brief.[30]

The following year, the General Assembly added to Code § 15.2-2204 what is now subsection D, requiring notice to military facilities within 3,000 feet of the land at issue. 2004 Va. Acts ch. 799 at 1228. The General Assembly made clear that such notice is "in addition

---

[30] The county in *Glazebrook* argued that one of the challengers "had actual notice of the hearings." Brief of Appellee at 8, *Glazebrook v. Bd. of Supervisors*, 266 Va. 550 (2003) (No. 022937). The landowners answered that actual attendance would not "cure inadequate published notice" and that "[t]he only time that attendance at a public hearing is relevant with respect to notice, is when someone entitled to mailed notice of a land use action appears and actively participates in the proceedings. Va. Code Ann. § 15.2-2204(B)." Reply Brief of Appellants at 8 & n.7, *Glazebrook v. Bd. of Supervisors*, 266 Va. 550 (2003) (No. 022937).

to the advertising and written notification as above required," *id.*, once more distinguishing advertising from written notice.

In 2005, the Supreme Court again strictly enforced subsection A's advertising requirements in *Gas Mart Corp. v. Board of Supervisors*, 269 Va. 334 (2005). *Gas Mart* was an interlocutory appeal under the Multiple Claimant Litigation Act involving more than 200 cases in Loudoun County challenging revisions to the county's zoning ordinance. *Id.* at 338. Following *Glazebrook*, the Court held that the board's advertisements failed the descriptive-summary requirement. *Id.* at 348. Once again, there was no suggestion that the advertising deficiencies were waived by any plaintiff with actual notice of the board's public hearing or who actively participated in it.

We too enforced the advertising requirements of subsection A in *Rebh v. County Board of Arlington County*, 80 Va. App. 754, *narrowed in part on other grounds and appeal dismissed*, 303 Va. 379 (2024) (per curiam). We found that the county's failure to include a descriptive summary in the advertisements for the public hearing rendered the ordinance void ab initio. *Id.* at 770. We did so without regard to whether any of the plaintiffs had actual notice of the hearing or actively participated in it.

As they did in the trial court, the Board and the developers rely on *Norfolk 102* and *Drewry*. They claim that both cases held that the actual-notice-waiver provision in Code § 15.2-2204(B) excuses advertising deficiencies under subsection A. We are not persuaded.

*Norfolk 102* is inapposite because it did not involve a claim that the governing body violated the advertising requirements of Code § 15.2-2204(A). The two companies there challenged the city council's denial of their special-exception request to serve alcoholic beverages. 285 Va. at 344. The companies claimed that the city council "denied them adequate

notice and a reasonable opportunity to be heard." *Id.* at 356. The Court disagreed, explaining that the companies "were notified two weeks in advance" and their representatives were present and addressed the council at the hearing. *Id.* at 356-57. The Court's statement—that the companies "had actual notice and actively participated in the City Council meeting, thus waiving any challenge to the notice based on the statutory provisions," *id.* at 357—must be read in the context of the claim before the Court: the adequacy of *individual* notice to the two companies. The Court was not addressing whether the governing body had properly advertised the hearing to the public at large under subsection A.

We likewise decline to read *Drewry* so expansively as to hold that any citizen who is aware of the public meeting is barred from claiming that the governing body violated the public advertising requirements. Drewry was a member of the Surry County Board of Supervisors who challenged the board's approval of a conditional-use permit for a methane-gas facility. 84 Va. App. at 485. He operated an agrotourism business on property that "was near—but not adjacent" to the proposed project. *Id.* at 485. He challenged the notice given for the planning commission's "September 2021 hearing" and for "the Board's January and June 2022 hearings." *Id.* at 490. But Drewry himself "attended" and "participated" in all three hearings. *Id.*

Notably, the public advertisements for all three hearings met the timing requirements under the version of Code § 15.2-2204(A) that was then in effect.[31] But Drewry claimed as to each meeting that the locality had failed to send written notice to all adjacent landowners as required by subsection B of the statute. *Id.* at 486. The Court said that the obvious purpose of

---

[31] At that time, Code § 15.2-2204(A) required that the hearing take place "not less than five days nor more than 21 days after the second advertisement," and the second advertisement had to be "not less than six days" after the first. *See* 2013 Va. Acts chs. 149, 213 (Code § 15.2-2204(A)). The ads for all three hearings met those requirements: advertisements ran on September 15 and 22 for the September 27, 2021 meeting; on December 22 and 29 for the January 6, 2022 meeting; and on May 18 and 25 for the June 2, 2022 meeting. *See Drewry*, 84 Va. App. at 486.

the statute was "to ensure that *adjacent landowners* have an opportunity to be heard," *id.* at 492 (emphasis added)—the specific concern of subsection B, not subsection A. Any such interest that Drewry had was satisfied by his actual attendance and participation in the meetings, as contemplated by subsection B:

> [A] party's "actual notice of and active participation in" the challenged proceeding satisfies those requirements and waives any challenges to alleged deficiencies in the received notice. The record establishes that Drewry had both actual notice and an opportunity to be heard. Accordingly, to the extent Drewry challenges the proceedings on the ground that he received deficient notice, he has waived that claim. Code § 15.2-2204(B).

*Id.* at 490-91 (citation omitted). The Court added that Drewry could not attack the notice on the basis that not all "adjacent landowners" had been given written notice under subsection B. *Id.* at 492. He could assert only his "own notice rights," not the rights of adjacent landowners who may not have received written notice. *Id.*

Thus, *Drewry* did not reach the question presented here: whether advertising deficiencies under subsection A of Code § 15.2-2204 that would otherwise render an ordinance void ab initio are excused when the plaintiff has actual notice of the hearing or actively participates in it. We decline to read *Drewry* to have held that without saying so. Making that leap would effectively recognize a new exception to subsection A that was neither mentioned nor suggested in *Town of Vinton*, *Potomac Greens*, *Glazebrook*, *Gas Mart*, or *Rebh*.

The position of the Board and the developers also has no limiting principle. If a plaintiff's actual notice of the public hearing waived advertising deficiencies under subsection A, what about a failure to advertise for "two successive weeks"? What about a failure to advertise at all? What if the public body fails to tell the public where the proposed zoning ordinance and plans can be reviewed? Indeed, suppose the planning commission fails to provide any public

- 48 -

notice or fails to review the proposal. Would a resident's actual notice or participation at the board hearing waive those deficiencies too? We think not.

Our conclusion dovetails with the Supreme Court's decision in *Berry v. Board of Supervisors*, 302 Va. 114 (2023), that a locality's failure to follow statutory requirements when enacting a zoning ordinance renders the ordinance void ab initio. *Id.* at 147-48. *Berry* involved the failure to follow the open-meeting requirements of the Virginia Freedom of Information Act. *Id.* at 147. That failure "prevented the public from participating in the manner required by VFOIA, and thus, potentially limited public participation and input into the process." *Id.* The Court said that "the Board's failure . . . is analogous to the circumstances in our prior cases in which a zoning ordinance was adopted despite the failure of the locality to provide the statutorily required public notice. In such cases, we have held that such ordinances are void *ab initio*." *Id.* at 147-48.

The same is true here. Subsection A of Code § 15.2-2204(A) protects the *public's* right to notice through newspaper advertising, a procedural safeguard ensuring broad community participation in important land-use decisions. Subsection B, by contrast, addresses *individual* notice rights by requiring written notice to affected and adjacent landowners. These are distinct protections serving different purposes. When a local governing body violates the public-advertising requirements in subsection A that are essential to its power to legislate, its action is void ab initio.

We reject the Board and the developers' counterargument that a resident who knows about the public hearing cannot complain about advertising deficiencies unless he can show how the advertising failure specifically harmed him. Of course, zoning-ordinance challengers must allege and prove standing. *See generally Oak Valley I*, 85 Va. App. at 391. But those with

standing are entitled to invalidate a zoning ordinance if they can show that the locality's advertising deficiencies under Code § 15.2-2204(A) rendered the ordinance void ab initio.

Indeed, *Morgan* held that neighboring landowners had standing to challenge a board's alleged failure to comply with the same advertising requirements at issue here. 302 Va. at 53, 65-66. The trial court there had found that the neighboring landowners lacked standing because the failure to provide adequate notice "affected the public at large and did not target the plaintiff homeowners." *Id.* at 65. The Supreme Court disagreed, explaining that the "claimant 'assuredly can' seek to enforce 'procedural rights' that affect the public at large 'so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.8 (1992)). "When the flawed procedure affects everyone, but the decision reached using this procedure causes particularized, 'concrete' harm to some, the latter have standing to challenge the procedure . . . ." *Id.* at 65-66 (citing *Lujan*, 504 U.S. at 573 & nn.7-8). So too here.

One might question the importance of requiring strict compliance with the advertising rules in Code § 15.2-2204(A). Strict compliance means that a locality's missing the deadlines by even one day renders the resulting ordinance invalid, potentially disrupting months of planning by staff and the applicant. But the General Assembly has seen fit to carefully specify the advertising necessary to empower a locality to enact a zoning ordinance. The legislature did not choose a rule of reason requiring only substantial compliance with the advertising requirements or only reasonable notice to the public. *Cf.* Code § 33.2-909(A) (permitting local governing bodies to "substantially" comply with the statutory notice procedures for abandoning a secondary road). The General Assembly instead adopted a per se rule that specifies exactly how to advertise. The General Assembly did so against the backdrop of caselaw that a locality's failure to comply with the advertising requirements renders the ordinance void ab initio. To *not* enforce

the advertising requirements as written would undo that legislative choice. It would also invite other localities to be less vigilant in following the statutory requirements.

Our resolution of the issues presented here is not influenced by the vibrant public debate surrounding data-center development.[32]  It is not our place to take sides in that debate because "judicial review does not evaluate 'the propriety, wisdom, necessity and expediency of legislation.'" *Appalachian Power Co. v. State Corp. Comm'n*, 301 Va. 257, 279 (2022) (quoting *Willis v. Mullett*, 263 Va. 653, 658 (2002)).  We must instead apply the advertising rules in Code § 15.2-2204(A) and the Prince William County ordinance to the rezonings at issue here.  Those requirements must be interpreted and applied objectively and consistently, without a thumb on the scale to favor or disfavor the particular land-use proposal in question.

In the end, we are bound by the longstanding rule that a public body's "[f]ailure to abide by the statutory prescriptions for the adoption of an ordinance renders the ordinance void *ab initio*." *Town of Jonesville v. Powell Valley Village L.P.*, 254 Va. 70, 74 (1997).  Because we have found that one or more of the Oak Valley plaintiffs has standing to challenge each of the three rezonings at issue, they are entitled to show that the advertising deficiencies invalidated those rezonings.  They have succeeded in that challenge.

*IV. The trial court erred in sustaining demurrers to the Burke plaintiffs' deficient-advertising claims.*

In *Burke* (Record No. 2025-24-4), we hold that Judge Hudson erred in sustaining the demurrers to the Burke plaintiffs' deficient-advertising claims, which were the same as those raised by the Oak Valley plaintiffs.  Judge Hudson relied on the saving provision in Code § 15.2-2204(A), finding that the Board had submitted "a correct and timely notice request"

---

[32] *See, e.g.*, Dave Ress, *Virginia data centers stir political passions, at county and state levels*, Richmond Times Dispatch (Dec. 2, 2025), https://tinyurl.com/by6cve55; Joint Legislative Audit and Review Commission, *Data Centers in Virginia* (2024), https://perma.cc/9CY5-8CQY.

and the *Post* failed to publish it. But the Burke plaintiffs alleged that the Board was at fault for the failure to publish. They alleged that the Board had only "inquired" about purchasing the advertisement and had "then failed to actually make that purchase." Burke Pet. ¶ 249 n.11. "[A] court considering a demurrer may ignore a party's factual allegations contradicted by the terms of authentic, unambiguous documents that properly are a part of the pleadings." *Ward's Equip.*, 254 Va. at 382. But the documents attached to the petition and in the administrative record admitted through oyer did not conclusively rebut the plaintiffs' allegation that the Board was at fault for the advertising failure. To the contrary, as shown in Part II.B.1 above, those documents supported the inference that the fault lay with the Board, not the *Post*.[33] Because the trial court failed to view the facts in the light most favorable to the Burke plaintiffs, it erred in sustaining the defendants' demurrers.

Still, our ruling in the *PWC* appeals invalidating all three rezonings moots the need to remand *Burke* for further proceedings in the trial court.[34] The procedural posture of *Burke* is the same as in *Rebh*, where we reversed and entered final judgment on the landowners' appeal from the trial court's decision sustaining the county board's demurrers. 80 Va. App. at 773. We found that the county board in Arlington had violated the descriptive-summary provision in Code § 15.2-2204(A), rendering the rezoning ordinance at issue void ab initio. *Id.* at 770, 773. Rather than reverse the demurrer ruling and remand for further proceedings, we reversed and entered final judgment. *Id.* at 773. Given our disposition of the *PWC* appeals, the same appellate remedy is appropriate here. *See* Code § 8.01-681 ("The appellate court shall . . .

---

[33] The attachments to the Burke plaintiffs' petition included the November 20, 2023 email from the *Post* to the Board's clerk that is reasonably interpreted to have put the Board on notice that it had not yet confirmed the advertisement. Burke Pet. Ex. S at Ex. A.

[34] Our ruling also makes it unnecessary to reach the Burke plaintiffs' other challenges to the trial court's order sustaining the defendants' demurrers.

reverse [the judgment], in whole or in part, if erroneous, and enter such judgment as to the court shall seem right and proper and shall render final judgment upon the merits whenever, in the opinion of the court, the facts before it are such as to enable the court to attain the ends of justice.").

CONCLUSION

In the *PWC* appeals, one or more of the Oak Valley plaintiffs has standing to challenge each of the three rezonings. Because the Board violated the advertising rules in Code § 15.2-2204(A) (Supp. 2023) and Prince William County Zoning Ordinance § 32-700.60 (2018), we affirm the trial court's judgment declaring the Compass, DG South, and DG North rezonings (Ordinances 23-57, 23-58, and 23-59) void ab initio. In *Burke*, we reverse the trial court's order sustaining the demurrer to Count IX. And in view of our affirming the judgment invalidating all three rezonings in the *PWC* appeals, we likewise enter final judgment in *Burke*.

Recognizing that the Board and the developers may appeal this decision to the Supreme Court of Virginia, we continue the partial stay that we entered on November 17, 2025. We thus stay the effectiveness of the judgment here except to the extent it prohibits the Board and the developers from engaging in any land disturbance or actual construction of the facilities pending further appeal. Unless otherwise altered by the Supreme Court, this partial stay will expire when there can be no further proceedings in the Supreme Court.

*Affirmed, Record Nos. 1584-25-4, 1590-25-4, and 1592-25-4.*
*Reversed and final judgment, Record No. 2025-24-4.*